O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MATTHEW DOWD; PETER DEMIAN;  ) Case No. CV 09-06731 DDP (SSx)
EDWARD LA GROSSA; ANTHONY     )
BROWN; NATHAN PINO, WILLIE    ) **ORDER GRANTING IN PART AND**
LEE TURNER; DAVID "ZUMA       ) **DENYING IN PART PLAINTIFFS' AND**
DOGG" SALTSBURG; THOMAS       ) **DEFENDANT'S CROSS MOTIONS FOR**
BURRUM  JNR; MARVIN SIMS;     ) **SUMMARY JUDGMENT**
JESSE BROWN; LOUIE GARCIA;    )
RENE CASTRO,                  ) [Dkt. Nos. 158 & 168]
                              )
                Plaintiff,    )
                              )
        v.                    )
                              )
CITY OF LOS ANGELES, a        )
municipal corporation,        )
                              )
                Defendants.   )
_____)

Presently before the court are Plaintiffs' and Defendant's Cross Motions for Summary Judgment.  Having considered the parties' submissions, heard oral argument, and ordered supplemental briefing, the court adopts the following order.

**I. BACKGROUND**

    **A. Factual History**

The Venice Beach Boardwalk (the "Boardwalk") is a major tourist attraction in the City of Los Angeles. LAMC §

42.15(A)(1)(a). It is "historically significant as a traditional public forum for its performance and visual artists, as well as other free speech activity." Id. During the summer and on weekends, the Boardwalk is filled with street performers, including "instrumental musicians, singers, jugglers, acrobats, mimes, comics, magicians, prophets, fortune tellers, and other assorted entertainers." City of Los Angeles Dep't of Recreation & Parks, http://www.laparks.org/venice/venice.htm (last visited Nov. 8, 2009). Plaintiffs are thirteen street performers and artists who make their living on the Venice Beach Boardwalk by, among other things, dancing, singing, painting, unicycling, playing music, as well as selling or accepting donations for items related to their performances, such as CDs, works of art, and T-shirts.

Over the years, the defendant the City of Los Angeles (the "City"), has adopted and amended a number of versions of Los Angeles Municipal Code ("LAMC") § 42.15, in order to address its concern that unregulated vending negatively effects the character, safety, and economic vitality of the Venice Beach Boardwalk and in response to litigation. In 2005, the City suspended the 2004 version of § 42.15, in response to the legal challenge raised in Venice Food Not Bombs v. City of Los Angeles, No. CV 05-04998 DDP (SS) (C.D. Cal. 2005), and later adopted an amended version of the ordinance as part of a settlement agreement in 2006. The settlement agreement was the culmination of intensive meetings and negotiations between the parties and community stakeholders, with the aid of the Court, in an effort to draft an ordinance that would address the City's concerns about unregulated vending while

///

protecting the rights of those who engage in activities protected by the First Amendment on Venice Boardwalk.

The City's adoption of the 2006 version of § 42.15 did not end all controversy concerning the vending ordinance and further litigation ensued. On January 14, 2009, this Court ruled in <u>Hunt v. City of Los Angeles</u>, 601 F. Supp. 2d 1158, 1170-72 (C.D. Cal. 2009), that the 2004 version of LAMC § 42.15(C) was unconstitutionally vague, because the exception to the vending ban for "merchandise constituting, carrying or making a religious political, philosophical, or ideological message or statement which is inextricably intertwined with merchandise," presented "a real risk of arbitrary and discriminatory enforcement because it fail[ed] to provide sufficient guidance to those who would enforce it." The Court did not reach the merits of the plaintiffs' facial void-for-vagueness challenge to a similar provision in the 2006 version of the ordinance, finding that the plaintiffs lacked standing to raise the claim. <u>Hunt</u>, 601 F. Supp. 2d at 1175.

In the face of such litigation, the City again amended § 42.15, with the latest draft taking effect on May 19, 2008. In enacting the 2008 version of LAMC § 42.15, the City found that (1) tourists are deterred from visiting the Boardwalk because they are harassed by unregulated vendors, (2) the limited amount of space on the Boardwalk should be assigned in order to avoid frequent altercations, (3) vendors and their equipment impede the ingress and egress of emergency and public safety vehicles, and (4) unregulated vending creates excessive and annoying noise on the Boardwalk that negatively affects nearby workers, visitors,

3

and residents. LAMC § 42.15(A)(1)(b)(i)-(vii). In response to these findings, LAMC § 42.15 (2008) provides that "[e]xcept as specifically allowed in this section, no person shall engage in vending" along the Venice Beach Boardwalk. Id. § 42.15(A).

The 2008 version of the ordinance divides much of the available space in the heart of the Boardwalk into individual spaces designated as P-Zone spaces and I-Zone spaces. Id. § 42.15(2). In the P-Zone spaces, "persons can perform, engage in traditional expressive speech, and petitioning activities, and vend the following expressive items: newspapers, leaflets, pamphlets, bumper stickers, patches, buttons, or books created by the vendor or recordings of the vendor's own performances . . . ." Id. § 42.15(2)(a). In the I-Zone spaces, "persons may engage in activities permissible in the P-Zone, and also engage in vending of expressive items created by the vendor, or the vending of expressive items that are inextricably intertwined with the vendor's message . . . ." Id. § 42.15(2)(b).

With certain limited exceptions, anyone wishing to use a P-Zone or I-Zone space during Peak Season must apply for an annual permit and enter into a lottery system by which spaces are assigned each day. Program Rules at pp. 2-3. The person to whom the space is assigned has priority to use the space. But, after 12:00 p.m., anyone (with or without a permit) may use any unoccupied space, so long as she engages only in activities approved for the P-Zones and relinquishes the space to the permit-holder if she returns.

Outside of the P- and I-Zones, anyone may engage in any activity permitted in the P-Zones and vend expressive items "inextricably intertwined with the vendor's message," so long as

1  she does not "set up a display table, easel, stand, equipment, or

2  other furniture, use a pushcart or other vehicle . . . ." Id. §

3  42.15(D)(1)(a). On the West side of the Boardwalk, outside of

4  the P- and I-Zones, anyone can engage in any permitted P-Zone

5  activity as long as it is "not vending and does not substantially

6  impede or obstruct pedestrian or vehicular traffic, subject to

7  reasonable size and height restrictions on any table, easel, or

8  other furniture . . . ." Id. § 42.15(D)(1)(b).

9      The ordinance and Program Rules also include noise

10  regulations. LAMC § 42.15(F)(1) provides that noise levels must

11  not exceed seventy-five decibels when measured at a distance of

12  twenty-five feet away or ninety-six decibels when measured from

13  one foot away between nine o'clock in the morning and sunset.

14  Furthermore, LAMC § 42.15(F)(4) bans the use of amplified sound

15  anywhere on the Boardwalk except in specially designated P-Zone

16  spaces between 17th Avenue and Horizon Avenue and between Breeze

17  Avenue and Park Avenue. The Program Rules clarify that amplified

18  sound "is permitted only in the designated spaces in the P-Zones in

19  the locations specified in Section 42.15 between 9:00 a.m. and

20  sunset, and is prohibited after sunset and before 9:00 a.m."

21  Program Rules at p. 4.

22      Following the City's adoption of the 2008 version of §

23  42.15, the Ninth Circuit decided Berger v. City of Seattle, 569

24  F.3d 1029 (9th Cir. 2009) (en banc), holding that a

25  designated-performance-space and permitting system established by

26  the City of Seattle for the Seattle Center was facially

27  unconstitutional under the First Amendment. In so holding, the

28  court noted that the Supreme Court "has repeatedly concluded that

single-speaker permitting requirements are not a constitutionally valid means of advancing [the government's] interests because, typically (1) they sweep too broadly, (2) they only marginally advance the government's asserted interests, and (3) the government's interests can be achieved by less intrusive means." Id. at 1038 (internal citations omitted). While acknowledging that such Supreme Court decisions involved permitting requirements for door-to-door solicitation, the court held that "it stands to reason that such [single-speaker permitting] requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith, than when applied to speech on a citizen's doorstep where substantial privacy interests exist." Id. at 1039. As a result, the court stated that it was "not surprising that we and almost every other circuit to have considered the issue have refused to uphold registration requirements that apply to individual speakers or small groups in a public forum." Id.

Shortly after the Ninth Circuit published its decision in Berger, 569 F.3d 1029, Plaintiffs filed this lawsuit raising facial and as-applied challenges to the 2006 and 2008 versions of LAMC §42.15 and its implementing Public Expression Permit Program Rules ("Program Rules") (revised April 2, 2008), arguing that they violate the First and Fourteenth Amendments. The facial challenges to the 2008 ordinance at issue here appear to be threefold: First, Plaintiffs argue that the permitting and designated performance space system is not a reasonable time, place and manner restriction and grants unbridled discretion to licensing authorities. Second,

Plaintiffs assert that the ordinance's use of the phrase "inextricably intertwined" renders it unconstitutionally vague. Third, Plaintiffs claim that the amplified sound ban is not a reasonable time, place, and manner restriction.

In order to voice their concerns over the ordinance and its enforcement, Plaintiffs Dowd and Saltsburg began attending Los Angeles City Council meetings and speaking during public comment sessions. Plaintiffs Dowd and Saltsburg raise facial and as-applied challenges to the City Council's Rules of Decorum.

**B.   Procedural History**

On October 8, 2009, the City filed a motion to dismiss the facial challenges to LAMC § 42.15 (2008) on the grounds that the ordinance is constitutional on its face.  The court denied the motion to dismiss with respect Plaintiffs' facial challenge to the permitting system and the amplified sound ban, and granted it with respect to Plaintiffs' facial challenge to the vending ban, holding that they did not have standing to pursue such a claim.  On October 16, 2009, Plaintiffs filed a motion for preliminary injunction. The court granted the injunction as to the amplified sound ban and the permitting and lottery system, and denied it as to the rules of decorum, the limitation of boardwalk activities at sunset, the height prohibition, and the rotation requirement.

The parties have now filed cross-motions for summary judgment on the constitutionality of the 2008 Ordinance, the amplified sound ban, the limitation of boardwalk activities after sunset, the height limitation, and the rules of decorum.

///

///

7

## II. LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248.

There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." Id.

**III. DISCUSSION**

**A. 2006 Ordinance**

The statute of limitations for suits under 18 U.S.C. § 1983 is governed by state law applying to tort actions for the recovery of damages for personal injuries. Silva v. Crain, 169 F.3d 608, 610 (9th Cir. 1999). In California, the statute of limitations for such personal injuries is two years. Cal. Civ. Proc. Code § 335.1. "Generally, the statute of limitations begins to run when a potential plaintiff knows or has reason to know of the asserted injury." Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1026-27 (9th Cir. 2007), quoting De Anza Properties X, Ltd. v. County of Santa Cruz, 936 F.2d 1084, 1086 (9th Cir. 1991). For facial challenges, the two year statute of limitations runs from the date that the challenged statute or ordinance went into effect, regardless of when a plaintiff learns of the enactment. Action Apartment Ass'n, Inc., 509 F.3d at 1027

1  (9th Cir. 2007)(internal citation and quotation marks omitted)

2  ("Given the general rule that the statute of limitations begins to

3  run when a potential plaintiff knows or has reason to know of the

4  asserted injury, it stands to reason that any facial injury to any

5  right should be apparent upon passage and enactment of a statute.")

6       The 2006 Ordinance became effective on March 25, 2006.  (City

7  Mot., Exh. 301.) Plaintiffs filed this action on September 16,

8  2009.  Thus, their facial challenge to the 2006 Ordinance was filed

9  more than a year after the statute of limitations period had

10 expired and such a challenge is time-barred.

11      The as-applied claims are likewise time-barred.  Any acts that

12 took place prior to September 16, 2007, and that give rise to an

13 as-applied challenge would be time-barred.  Because the 2006

14 Ordinance was suspended in July 2007 (FAC ¶ 50), any act of

15 enforcement of the 2006 Ordinance would have taken place prior to

16 July 2007, and would necessarily be time barred.

17      For these reasons, the court GRANTS summary judgment in favor

18 of Defendant on all claims relating to the 2006 ordinance.

19      **B. Permit and Lottery System**

20      "A permitting requirement is a prior restraint on speech and

21 therefore bears a 'heavy presumption' against its

22 constitutionality." Berger, 569 F.3d at 1037 (internal citation

23 omitted).  "The presumptive invalidity and offensiveness" of such

24 systems "stem from the significant burden they place on free

25 speech.  Both the procedural hurdle of filling out and submitting a

26 written application, and the temporal hurdle of waiting for the

27 permit to be granted may discourage potential speakers." Id. at

28 1037-38 (internal citation and quotation marks omitted).  Even

where the government has a significant interest, the Supreme Court has concluded that "single-speaker permitting requirements are not a constitutionally valid means of advancing those interests because, typically, (1) they sweep too broadly . . . (2) they only marginally advance the government's asserted interests, . . . and (3) the government's interests can be achieved by less intrusive means." Id. at 1038.  "Although the Supreme Court has not addressed the validity of single-speaker permitting requirements for speech in a public forum, it stands to reason that such requirements would be at least as constitutionally suspect when applied to speech in a public park, where a speaker's First Amendment protections reach their zenith." Id. at 1039.  The "venerable tradition of the park as public forum has . . . a very practical side to it as well: parks provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards." Grossman v. City of Portland, 33 F.3d 1200, 1205 (9th Cir. 1994).

     Nonetheless, "local governments can exercise their substantial interest in regulating competing uses of traditional public fora by imposing permitting requirements for certain uses." Santa Monica Food Not Bombs v. Santa Monica, 450 F.3d 1022, 1038 (9th Cir. 2006).  A local government may issue reasonable regulations governing the time, place, or manner of speech. Berger, 569 F.3d at 1036.  "To be upheld as a constitutional time, place or manner restriction, a permit requirement applying to First Amendment activity in a public park must (1) be content neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of expression."

1    Grossman, 33 F.3d at 1205.  "When the Government restricts speech,

2    the Government bears the burden of proving the constitutionality of

3    its actions."  United States v. Playboy Entm't Grp., Inc., 529 U.S.

4    803, 804 (2000).  See also  Berger, 569 F.3d at 1048; Kuba v. 1-A

5    Agr. Ass'n, 387 F.3d 850, 858-63 (9th Cir. 2004).

6         This court granted a preliminary injunction with respect to

7    the permit and lottery system, finding that in light of the Ninth

8    Circuit's decision in Berger v. City of Seattle, 569 F.3d 1029

9    (2009), "the permit requirement is likely to violate the First

10   Amendment."  (2010 Order at 26.)  Berger concerned a permitting

11   system employed by the 80-acre Seattle Civic Center which, among

12   other things, required street performers to obtain permits before

13   performing anywhere at the Center and to wear a badge while

14   performing, and limited street performances to sixteen designated

15   locations.  Id. at 1035.  The court in Berger rejected the argument

16   that the permitting system promoted the government's interests in

17   deterring wrongful conduct by threatening the loss of a permit and

18   by identifying rulebreakers so as to notify them of alleged

19   violations.  Id. at 1044.  The court held that such goals could be

20   accomplished just as effectively by requiring a person observed

21   violating the rules to identify herself and an after-the-fact

22   penalty, such as the loss of the right to perform or a fine.  Id.

23   at 1043.

24        The Berger court did not strike down the sixteen designated

25   performance locations, noting that "the delineation of performance

26   areas, particularly in the most sought-after locales, might pass

27   constitutional muster on a more developed factual record."  Id. at

28   1045.  The court held that the City submitted undisputed evidence

12

1  that before the location restriction, there were weekly complaints
2  from park tenant about street performers blocking entranceways and
3  egresses, and the location rule did promote the City's interest in
4  reducing these problems.  Id. at 1049.  It found an issue of fact
5  as to whether the location restriction left "ample alternative
6  channels for communication."  Id.

7      The permitting and lottery system in this case differs in
8  several respects from the system struck down in Berger.  First,
9  street performers may still perform anywhere else on the Boardwalk,
10 although they are limited in terms of what items they can use
11 (i.e., they cannot use pushcarts or tables elsewhere).  Second, the
12 lottery system assigns spaces to a particular person (or large
13 performance group) for a particular day.  However, after 12:00 p.m.
14 each day any person, with or without a permit, may use an
15 unoccupied P-Zone space and any person with an I-Zone permit may
16 use an unoccupied I-Zone space, so long as she relinquishes the
17 space should the lottery winner return.  Third, insofar as an
18 applicant seeks an I-Zone permit, she is required to disclose (1)
19 her name and mailing address, (2) a description of the goods or
20 merchandise for which she seeks a permit, and (3) a declaration
21 that the goods or merchandise are expressive items inextricably
22 intertwined with the applicant's message.

23     This court determined that the permitting and lottery system
24 was likely unconstitutional because "[t]here is no explanation as
25 to why this system manages conflicting claims to limited space any
26 more effectively than a simple first-come-first-served rule."
27 (2010 Order at 26.)  The court now considers whether the City has
28

13

met its burden of showing that the permit system is narrowly
tailored to promote its interest.

### 1. Content-Neutrality

"A regulation is content-based if either the underlying
purpose of the regulation is to suppress particular ideas or, if
the regulation, by its very terms, singles out particular content
for differential treatment." Reed v. Town of Gilbert, AZ, 597 F.3d
966, 974 (9th Cir. 2009)(quoting Berger, 569 F.3d at 1051).

Plaintiffs argue that the Ordinance is content-based because
in the P-Zone spaces, persons can perform, engage in traditional
expressive speech, and petition, but can vend only certain
expressive items: "newspapers, leaflets, pamphlets, bumper
stickers, patches, buttons, or books created by the vendor or
recordings of the vendor's own performances." LAMC § 42.15(2)(a).
In the I-Zone spaces "persons may engage in activities permissible
in the P-Zone, and also engage in vending of expressive items
created by the vendor, or the vending of expressive items that are
inextricably intertwined with the vendor's message." Id. §
41.15(2)(b). Plaintiffs argue that these require an officer to
examine the content of the speech in order to determine whether it
is permissible, because an officer must consider what matter
qualifies as "newspaper," "leaflet" or "pamphlet"; whether an item
has been "created, written or composed by the vendor"; whether an
item is "inherently communicative"; whether an item has "nominal
utility apart from its communication"; and other aspects of the
speech. (Dowd Mot. at 13-14.)

Plaintiffs argue that such determinations are content-based by
analogy to Forsyth County v. Nationalist Movement, 505 U.S. 123

(1992).  There, the county of Forsyth, Georgia, passed an ordinance
that allowed the county to adjust the fee for demonstration permit
"in order to meet the expense incident to the administration of the
Ordinance and to the maintenance of public order in the matter
licensed."  Id. at 127.   The Court determined that the ordinance
was content based because "the fee assessed will depend on the
administrator's measure of the amount of hostility likely to be
created by the speech based on its content.  Those wishing to
express views unpopular with bottle throwers, for example, may have
to pay more for their permit."  Id. at 134.

     Here, none of the characteristics an officer must consider is
based in the subject matter of the message.  Determining whether a
piece of literature is a "pamphlet" or a t-shirt, for instance,
involves a consideration of form rather than content; the message
conveyed is immaterial.  While an officer must discern whether an
object is inherently communicative, the inquiry is only whether the
object is inherently communicating any message, not whether the
object is communicating a message on a specific topic.  Unlike Foti
v. City of Menlo Park, 146 F.3d 629, 633-34, where a city
prohibited the posting of signs on public property with the
exception of signs containing certain content (real estate open
houses, safety and traffic notices, etc.), here the Ordinance does
not target or privilege any particular message.  Thus the Ordinance
is not content based in the traditional sense of privileging or
discriminating against certain topics.  While it is by no means
obvious whether certain objects are inherently communicative, even
the close cases would depend not on the topic of the message but on
the nature of the object.

The court finds that the 2008 Ordinance is not content based.

**2. Narrow Tailoring**

The City has met its burden in demonstrating that the 2008 Ordinance responds to a significant government interest.  The 2008 Ordinance contains the following findings:

> The amount of space on the Boardwalk that is available for performing and visual artists and for political advocacy is limited due to the size of the Boardwalk and the large crowds of visitors that the Boardwalk attracts. Due to the limited amount of space, unregulated vending along the Boardwalk prevents many persons from engaging in performance, art, advocacy or other expressive activities. Prior to the City's Board of Recreation and Parks Commission establishing a program for assignment of spaces, unregulated vending resulted in conflicting claims for the available space.  There were numerous altercations over the locations and amounts of space that any one person or organization could use. Frequently, the altercations became violent, requiring law enforcement response to preserve the public peace.  Persons wishing to secure spaces often arrived prior to dawn and created loud noises in setting up their displays, thereby disturbing the public peace and requiring a law enforcement response.  Unregulated, the Boardwalk became a place where only the strongest and earliest arrivals could secure space to exercise their rights of free expression without threat of intimidation.  It is, therefore, necessary to regulate the use of the limited space on the Boardwalk to prevent conflicting claims for the space and to allocate the limited space available fairly to all who desire to use it for lawful purposes.

LAMC (2008) § 42.15(A)(1)(b)(ii).  The court accepts these findings as evidence of a significant government interest.  "As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners." City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 451 (2002)(J. Kennedy concurring).  See also Alameda Books, Inc. v. City of Los Angeles, 631 F.3d 1031, 1042-43 (9th Cir. 2011).  Plaintiffs have presented no evidence creating an issue of fact in this respect.

The City must also present evidence that the Ordinance was narrowly tailored to advance this interest.  On its face, the Ordinance was crafted to remedy the problems identified in the findings.  Unlike the ordinance in Berger, the 2008 Ordinance was a space allocation system which assigned performers to particular spots to effectively distribute the limited space of the Boardwalk. The permits combined with the lottery system provided a mechanism for officers to resolve disputes about space allocation in a neutral manner.  The lottery system was also designed to discourage pre-dawn arrival at the Boardwalk in order to secure a space, and to expand the pool of potential performers to include speakers who might not assert themselves in a first-come-first-serve situation. The ordinance thus appears to be carefully crafted to resolve the problems identified in the findings.  "[T]he regulation responds precisely to the substantive problems which legitimately concern the Government."  Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 297 (1984)(internal citations and quotation marks omitted).

The City presents some evidence that the permit system managed space more effectively than the first-come-first-serve system.  The City cites a declaration from Victor Jauregui, Senior Recreation Director II within the City of Los Angeles Department of Recreation and Parks, stating that "[t]he space allocation system with the lottery eliminated many of the prior disturbances and problems over spaces.  It also allowed those who could not arrive at the crack of dawn or who were not the most aggressive to have a chance to be assigned a space at the Boardwalk."  (Jauregui Decl. ¶ 8.) Jauregui also stated that with space assignment through the permit and lottery, "City staff had a neutral way to determine who was

1   entitled to the space by looking at the lottery results." (Id. ¶

2   9.)

3       Plaintiffs present evidence that a performer who did not

4   obtain a permit through the lottery would not have a permit for a

5   seven days or had to wait until 12:00 p.m. to obtain a space.

6   (Dowd Decl. ¶ 10.)  Performers did not always obtain spots. (See

7   e.g. LaGrossa Decl. ¶ 10, stating that he obtained spots 60% of the

8   time.)  Plaintiff Demian asserts that his income was reduced

9   because he could not use his amplifier in all spots and did not

10  always get a spot where amplification was permitted. (Demian Decl.

11  ¶ 33.)

12      Plaintiffs also present declarations to the effect that the

13  Ordinance increased tensions among them. See e.g. Demian Decl. ¶

14  14 ("Because of us being cramped together like that [in the large

15  performance spaces], there would be a lot of anger sometimes"),

16  LaGrossa Decl. ¶ 9 ("[T]hey put us like crabs in a barrel, and so

17  naturally there's going to be fights."), Brown Decl. ¶ 11, noting

18  that there were still disputes with the permit system, but now they

19  are between "people trying to get spaces to sell things.").[1]

20      Plaintiffs' evidence shows that there was some tension on the

21  Boardwalk among performers, but this does not create an issue of

22  _____

23      [1]The City objects to these statements as opinion rather than
    fact and therefore inappropriate for declarations. (City's

24  Objections to Plaintiffs' Declarations.) See Fed. R. Civ. P. 56(c)
    ("An affidavit or declaration used to support or oppose a motion

25  must be made on personal knowledge, set out facts that would be
    admissible in evidence, and show that the affiant or declarant is

26  competent to testify on the matters stated.") and L.R. 7-7
    ("Declarations shall contain only factual, evidentiary matter and

27  shall conform as far as possible to the requirements of F.R.Civ.P.
    56(c)(4).") The court finds that the declarations are based on the

28  performers' first-hand knowledge of the interactions among
    performers on the Boardwalk and is therefore admissible.

fact as to whether altercations decreased; as the City points out,
there could be fewer altercations and noise disturbances alongside
some tensions and altercations among performers.  In addition, the
City is not required to achieve its substantial interest with the
least speech-restrictive alternative.  Clark, 468 U.S. at 299.
Plaintiffs' evidence is not persuasive in demonstrating that the
Ordinance was speech restrictive; it shows instead that Plaintiffs
had objections to certain aspects of the Ordinance.  That does not
necessarily amount to a restriction on speech.

### 3. Alternative Channels of Expression

As the court pointed out in its 2010 Order, another important
difference between this Ordinance and the one in Berger is that in
Berger, the park required a permit for performers who wished to
perform anywhere in the park.  Here, the permit is required only
for those performers who wish to set up their equipment and remain
in a one-mile stretch of the Boardwalk.  Performers are free to
express themselves without using a table or other equipment within
that one-mile area.  They may occupy spaces that are not occupied
after noon each day, provided they relinquish the space if the
person to whom it was assigned appears.  Additionally, they may set
themselves up on the Boardwalk outside that one-mile area without
obtaining a permit.[2]

The Ordinance thus provides alternative channels of
expression.

---

[2] In itself, the fact that performers could set up tables for
speech outside the one-mile area would not provide a sufficient
alternative channel of communication.  Although one mile is a
limited slice of the Boardwalk, it is nonetheless a significant
area, especially for a person who wished to express a message to as
broad an audience as possible.

19

#### 4. Vagueness challenge

The court previously found that Plaintiffs do not have standing to challenge the vending ban as void for vagueness because of its exception for expressive items that are 'inextricably intertwined' with the speaker's message. (2010 Order at 11.) The court found that "Plaintiffs engage in activities that do not fall within the ambit of the anti-vending regulations, as they are street performers who engage in traditional expressive speech, vend expressive items they have created, and sell recordings of their own performances. In fact, none of the Plaintiffs claims to have been chilled from performing or vending any items based on the anti-vending regulations." (2010 Order at 11-12.) The court therefore dismissed Plaintiffs' facial void-for-vagueness challenge to the vending ban and its exception for expressive items "inextricably intertwined" with the speaker's message. <u>Id.</u> at 13. The court nonetheless indicated that "insofar as the Plaintiffs argue that the permitting scheme grants unbridled discretion to licensing officials because of its incorporation of the 'inextricably intertwined' standard, that claim survives the City's motion to dismiss." (<u>Id.</u> at 13 n.2.)

Plaintiffs assert that "[o]n the more fully developed record, Plaintiffs have standing to challenge the vending ban as void for vagueness. Plaintiffs engage in activities that fall within the ambit of the anti-vending regulations despite the fact that they are also street performers who engage in traditional expressive speech. Plaintiffs do claim to have been chilled from performing or vending any items based on the police harassment and enforcement of the anti-vending regulations." (Dowd Mot. at 24.) They also

1    assert that they are challenging the vagueness of other terms in §

2    42.15, including "inherently communicative," "nominal utility apart

3    from its communication," "some expressive purpose," and "dominant"

4    non-expressive purpose.  (Id.)

5         Despite these assertions, Plaintiffs fail to distinguish these

6    claims from the claims dismissed by this court in the 2010 Order or

7    to point to those portions of the "more fully developed record"

8    that purportedly give them standing to challenge the vending ban

9    despite the previous dismissal of this claim.  Noting that

10   "Plaintiffs' Declarations amply demonstrate a 'serious interest in

11   subjecting themselves to' the challenged measure, and that the City

12   is 'seriously intent on enforcing the challenged measure' against

13   them" without pointing to factual evidence in the record is

14   insufficient to establish a genuine issue of material fact.  (Dowd

15   Reply at 4.)  Nor is it sufficient for Plaintiffs to state that

16   "[g]iven the limitations of space, all of those facts [in the

17   Statement of Uncontroverted Facts and Conclusions of Law] cannot be

18   repeated here and the Court is encouraged to review the

19   Declarations and the Statement in detail."  (Dowd Mot. at 2.)  It

20   is not the court's task "to scour the record in search of a genuine

21   issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1278 (9th

22   Cir. 1996).  Counsel has an obligation to lay out the support

23   clearly.  Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031

24   (9th Cir. 2001).  The court "need not examine the entire file for

25   evidence establishing a genuine issue of fact, where the evidence

26   is not set forth in the opposition papers with adequate references

27   so that it could conveniently be found."  Id.

28

1    The court finds that Plaintiffs' vagueness challenge was

2  previously dismissed and that Plaintiffs have failed to present

3  evidence sufficient to cause the court to take up the issue again.

4    **C. Amplified Sound Ban**

5    The use of a sound amplification device is protected by the

6  First Amendment.  Saia v. New York, 334 U.S. 558, 561 (1948).  As

7  discussed above, "the City has the burden of justifying the

8  restriction on speech."  Klein v. City of San Clemente, 584 F.3d

9  1196, 1201 (9th Cir. 2009).  In order for a regulation of amplified

10  sound to comport with the First Amendment, it must (1) be

11  "'justified without reference to the content of the regulated

12  speech,'" (2) be "'narrowly tailored to serve a significant

13  government interest,'" and (3) "'leave open ample alternative

14  channels for communication of the information.'" Ward v. Rock

15  Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty.

16  for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

17    LAMC § 42.15(F)(4) and the Program Rules ban the use of

18  amplified sound anywhere on the Boardwalk except in specially

19  designated P-Zone spaces between 17th Avenue and Horizon Avenue and

20  between Breeze Avenue and Park Avenue.  (2008 Ordinance, §§

21  42.15(D)(2)(c) and (F).)  Fifty-six out of the 105 P-Zone spaces

22  were in the area in which amplified sound was permitted.  The

23  ordinance also allowed the City to issue special events permits for

24  amplified sound.  (2008 Ordinance, § 42.15(F)(6).)

25    The City now asserts that the amplified sound ban is intended

26  not only to protect residential areas from excess noise, but also

27  to balance the expressive needs of various Boardwalk users.  (2008

28  Ord. 42.15(A)(1)(b).  It points out that there are other noise

22

regulations applicable to the Boardwalk as a whole and that the
2008 Ordinance addressed the use of amplified sound as "one of
numerous issues involving vendors and performances" on the western
side of the Boardwalk.  (City Reply at 21.)

The court finds that although the city has an interest in
balancing the expressive needs of various Boardwalk users and in
regulating the noise levels on the Boardwalk, this ordinance is not
narrowly tailored because it targets only one aspect of the
problem, namely, the sound emanating from the west side of the
Boardwalk.  It does not address sound emanating from the east side
or from visitors.

The amplified sound ban thus places the burden of achieving
the government's purpose upon one group.  "[A]lthough the chosen
restriction need not be the least restrictive or least intrusive
means available to achieve the government's legitimate interests,
the existence of obvious, less burdensome alternatives is a
relevant consideration in determining whether the 'fit' between
ends and means is reasonable."  Berger v. City of Seattle, 569 F.3d
at 1041.  Performers in the eight most northern blocks of the
Boardwalk are banned from using any amplification.  This ban
intrudes on those performers' attempts to make themselves heard.
See e.g. Demian Decl. ¶ 9 (stating that the amplified sound ban
made it too difficult to perform acoustically because it is
impossible to "project" enough to be heard).  The obvious less
restrictive alternative to the absolute amplified sound ban is a
decibel limit that would apply to all users of the Boardwalk, on
both sides.  The Boardwalk already has a decibel limit of 75bDA at
25 feet and 96 dBA at one foot.  LAMC § 42.15(F).  If the overall

sound level is the problem the Ordinance is meant to address, the obvious less restrictive alternative is for the City to decrease the maximum decibel limit on both sides of the Boardwalk, rather than barring all amplification by performers on the west side.

The court finds that the amplified sound ban is not narrowly tailored and therefore facially unconstitutional.  The court GRANTS summary judgment in favor of Plaintiffs on this issue.

### 3. Height Limitation

The 2008 Ordinance includes a height restriction: "No person shall place or allow any item (except an umbrella or other sun shade) exceeding four feet above ground in any designated space . . . ."  (Section 42.15 (2008) G(2)(b).  See also Program Rules, Public Expression Program Regulations, p.6.)  Although regulating equipment, this section of the Ordinance arguably constrains communicative conduct and therefore is subject to a challenge under the First Amendment.  Vlasak v. Superior Court of California ex rel. County of Los Angeles, 329 F.3d 683, 687 (9th Cir. 2003).  Again, the City bears the burden of demonstrating that the Ordinance "advances a substantial governmental interest and that it is narrowly tailored to prevent no more than the exact source of the 'evil' it seeks to remedy."  Edwards v. City of Coeur d'Alene, 262 F.3d 856, 863 (9th Cir. 2001)(quoting Frisby v. Schultz, 487 U.S. 474, 485 (1988)).

The 2008 Ordinance includes the following findings:

> (iv) The vendors and their equipment may impede the ingress and egress of emergency and public safety vehicles by creating physical obstacles to emergency response and administration of aid to those in need of immediate medical attention and to victims of criminal activity.  It is therefore necessary to regulate vendors and their use of equipment to avoid interference with

1       emergency response vehicles that provide assistance to
2       individuals with medical needs and victims of criminal
     activity.

3       ...

4       (vi) Unregulated vending causes visual clutter/blight
     along the Boardwalk, impedes the views of the beach and
5       the Pacific Ocean, and threatens the City's ability to
     attract tourists and preserve businesses along the
6       Boardwalk.  It is therefore necessary to regulate the
     number of vendors, the size of their equipment, and
7       displays, and the location of vending activity.

8  Sec. 42.15 A.1.(b).

9       As discussed above, the City has the burden to demonstrate

10  that the Ordinance is narrowly tailored to promote a significant

11  interest.  The City presents evidence that it has a substantial

12  interest, as stated in the Ordinance's findings, in facilitating

13  emergency access and reducing visual clutter.  See Honolulu Weekly,

14  Inc. v. Harris, 298 F.3d 1037, 1045 (9th Cir. 2002) ("both the

15  Supreme Court and this Court have found that aesthetics can be a

16  substantial governmental interest."); Members of City Council of

17  City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805

18  (1984)("It is well settled that the state may legitimately exercise

19  its police powers to advance esthetic values.").

20       Plaintiffs argue that the height restriction is not narrowly

21  tailored to achieve those interests because it imposes a

22  significant burden on performers, who often use microphone stands,

23  musical instruments, and other props such as ladders, which are

24  higher than four feet.  They also argue that it is irrational

25  insofar as it makes an exception for umbrellas.

26       In Vlasak, cited by the City, the Ninth Circuit upheld Los

27  Angeles Municipal Code section § 55.07, which prohibits the

28  "carrying or possession of certain 'demonstration equipment'-

rectangular wooden pieces more than 1/4 inch thick and 2 inches
wide, or non-rectangular pieces thicker than 3/4 inch." Vlasak,
329 F.3d at 686.  The court found that, unlike a broad ban on all
signs attached to wooden or plastic handles, this ordinance was
"narrowly tailored to meet the substantial interest in public
safety," that "[t]he dimension restrictions . . . are not
substantially broader than necessary to achieve the government
interest," and that the ordinance did not "deprive[] demonstrators
of alternative means of communication." Id. at 690.  The court
found that the ordinance was narrowly tailored because it advanced
the public safety interest by limiting the size of handles that
could be used as weapons while still allowing demonstrators to
communicate their message in the form they chose (placards).

     Here, the City does not explain why a four feet restriction,
as opposed to a three feet or a six feet restriction, advances its
interest.  Nonetheless, "particularly where conduct and not merely
speech is involved, . . . the over-breadth of a statute must not
only be real, but substantial as well, judged in relation to its
plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601,
615 (1973).  Here, the regulation, while limiting some speech, is
not substantially overbroad; Plaintiffs have some limitations on
their performances - they cannot use microphones of a certain
height, and performers accustomed to performing from ladders are
unable to do so - but the limitations leave ample channels of
communication while advancing the City's interests.  The
limitations placed on Plaintiffs' performances are not so
substantial as to lead the court to micromanage the City's
regulation of public safety and aesthetics.

1   The court GRANTS summary judgment in favor of Defendants on

2   this issue.

3              **4. Rotation Requirement**

4       The 2008 Ordinance allocates 5 of the 105 spaces in the P-Zone

5   to large act/performance groups that draw an audience of 25 or more

6   persons on average.  (2008 Program Rules at 2.)  The Program Rules

7   state:

8          the space(s) may be rotated once every hour beginning at
           11:00 a.m., if more than one performer or group wants the
9          same space.  Example: if two group/performers want space
           D, they would alternate performances on an hourly basis
10         beginning at 11:00 a.m.

11  Id. at 6.

12      The 2008 Ordinance includes findings, discussed above, that

13  the Boardwalk is a limited space, and that altercations took place

14  to obtain available space.  LAMC Section 42.15 (1)(b)(ii).  To

15  accommodate groups that would attract large numbers of people, the

16  Ordinance set aside a certain number of spaces into which

17  performers could rotate.  Plaintiffs point to a litany of problems[3]

18  with the rotation requirement, including the fact that there is no

19  cap on the number of performers who can be in the rotation; the

20  ordinance privileges "popular" speech attracting 30 or more people

21  over less popular speech; performers must predict how large their

22  audience will be; police have too much discretion to determine

23  whether the act attracted a large enough audience; and it is vague,

24  leading to arbitrary enforcement by the police.

25

26  _____

27      [3] Plaintiffs do not cite to any evidence in their papers.
    Once again, it is not the court's task "to scour the record in
28  search of a genuine issue of triable fact."  Keenan v. Allan, 91
    F.3d 1275, 1279 (9th Cir. 1996).

1    The court finds that Plaintiffs have not created an issue of
2    fact as to the narrow tailoring of the rotation requirement.  As
3    discussed with respect to the height requirement, the court finds
4    that the rotation requirement does not burden substantially more
5    speech than necessary.

6        The court GRANTS summary judgment to Defendants on this issue.

7                    **5. Sunset Requirement**

8        The Program Rules restrict all activity in designated spaces
9    to the period between 9 a.m. and sunset.  (2008 Program Rules at
10   6.)  The City has presented evidence that the purpose of the
11   requirement is to "ensure [the Boardwalk] is clean and safe for the
12   crowds of people that will visit the following day."  (Decl.
13   Jauregui ¶ 10.)  Plaintiffs allege that this is not a reasonable
14   time, place, and manner restriction because sunset times change
15   each day, the marine layer prevents visual observation of the
16   sunset, tourists leave the park after - but not before - sunset,
17   and other parks close one hour after sunset.  (FAC ¶ 43.)
18   Plaintiffs assert that it would be more reasonable for the park to
19   close one hour after sunset.  (<u>Id.</u>)  It is not clear how these
20   allegations, unsupported by evidence, amount to evidence that the
21   requirement burdens more significantly speech than necessary and is
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

1  not narrowly tailored.[4]  The court finds that there is no issue of

2  fact and GRANTS summary judgment in favor of the City.

3      **D. Rules of Decorum**

4      Plaintiffs seek a declaratory judgment that certain of the Los

5  Angeles City Council Rules of Decorum violate the First Amendment

6  and Article 1 § 2 of the California Constitution.  (Compl., Prayer

7  for Relief, ¶¶ 2,3.)  They also seek a declaratory judgment that

8  "the challenged sections of the Council Rules are 'unconstitutional

9  as-applied,' as well as an order expunging all violations and

10 citations of those rules "in any and all files maintained by the

11 City."  (Id., Prayer for Relief, ¶¶ 4, 5.)  They also seek a

12 preliminary injunction against the Rules of Decorum.  (Id., Prayer

13 for Relief, ¶ 1.)

14      **1. Facial Challenge**

15      Under Ninth Circuit law, city council meetings, "once opened,

16 have been regarded as public forums, albeit limited ones." White

17 v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir. 1990).  "A

18 council can regulate not only the time, place, and manner of speech

19 in a limited public forum, but also the content of speech -- as

20 long as content-based regulations are viewpoint neutral and

21 enforced that way." Norse v. City of Santa Cruz, 629 F.3d 966, 975

22 (9th Cir. 2010).  However, rules of decorum are constitutional if

23

24      [4] Again, Plaintiffs do not refer in their papers to any
   evidence on this point in their moving papers or opposition.  It
25 appears that the evidence they have on this point is presented in
   response to the City's Uncontroverted Fact number 19, which states
26 the purpose of this section of the Ordinance as being to make the
   Boardwalk clean and safe for the following day and to reduce noise
27 in the adjacent residential neighborhoods.  Plaintiffs present over
   four pages of purported evidence, but it is non-responsive, as it
28 deals primarily with the continuing presence of conflicts among
   performers.

they "only permit[] a presiding officer to eject an attendee for actually disturbing or impeding a meeting." Acosta v. City of Costa Mesa, 718 F.3d 800, 811 (2013)(quoting Norse, 629 F.3d at 976).

In Norwalk, the Ninth Circuit considered a facial challenge to council rules nearly identical to those at issue in this case. The relevant portion of the rule was the following:

> Each person who addresses the Council shall not make personal, impertinent, slanderous or profane remarks to any member of the Council, staff or general public. Any person who makes such remarks, or who utters loud, threatening, personal or abusive language, or engages in any other disorderly conduct which disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting shall, at the discretion of the presiding officer or a majority of the Council, be barred from further audience before the Council during that meeting.

Norwalk, 900 F.2d at 1424. The Ninth Circuit did not consider the constitutionality of the rule on its face and held that because the rule was "readily susceptible" to be interpreted as requiring "that removal can only be ordered when someone making a proscribed remark is acting in a way that actually disturbs or impedes the meeting," it did not violate the First Amendment. Id.

Here, the Rule in question is similar to the rule in Norwalk:[5]

> Persons addressing the Council shall not make personal, impertinent, unduly repetitive, slanderous or profane remarks to the Council, any member of the Council, staff or general public, nor utter loud, threatening, personal or abusive language, nor engage in any other disorderly conduct that disrupts, disturbs or otherwise impedes the orderly conduct of any Council meeting.

---

[5] The two are distinguishable in that the Norwalk rule uses "which" where the L.A. rule uses "that," a point which could be significant if a strict grammatical interpretation were performed. See notes 2 and 3 below.

1   (FAC ¶ 64; City Mot. Exh. 306, Rules of the Los Angeles City

2   Council As Amended (July 2009), Ch. 1 Rule No. 12(a).)

3        There are at least three possible interpretations of the Rule.

4   First, reading the sentence as three disjunctive clauses separated

5   by "nor," it could be taken to state that certain kinds of speech

6   are not allowed (personal, impertinent, repetitive, slanderous,

7   threatening, etc.) and additionally that "disorderly conduct" that

8   is disruptive is not allowed.  Read this way, there is no "actual

9   disruption" required for there to be a breach of the rule.  A

10  second interpretation is that the final clause ("that disrupts,

11  disturbs or otherwise impedes the orderly conduct of any Council

12  meeting") could be taken to modify all three sets of speech and

13  behavior,[6] thus imposing an "actual disturbance" requirement on all

14  types of speech and conduct listed.  Third, the final clause -

15  "nor engage in any other disorderly conduct that disrupts, disturbs

16  or otherwise impedes the orderly conduct of any Council meeting" -

17  could be taken to indicate that the first two types of speech or

18  conduct (profanities, slander, abusive language, etc.) are a type

19  of conduct that inherently "disrupts, disturbs, or otherwise

20  ///

21  ///

22  ///

23  ───────────────────

[6] This is an ungrammatical reading of the Rule.  "That" introduces
"a clause defining or restricting the antecedent, and thus
completing its sense."  Oxford English Dictionary online, "that,
pron.2."  Sept. 2012.  Oxford Univ. Press.
<http://www.oed.com/view/Entry/200178?rskey=U6kljt&result=3&isAdvan
ced=false>. (Nov. 29, 2012.)  Here, as a grammatical matter it is
clear that "that" is restricting the meaning of "disorderly
conduct," not of the clauses preceding the sentence's final "nor."
Nonetheless, given the widespread confusion concerning the use of
"that" and "which," the court will not base a determination of
whether the rule is "readily susceptible" to a certain
interpretation on that interpretation's grammatical precision.

impedes the meeting," and that other, similarly disruptive conduct is also prohibited.[7]

Only the second construction, which imposes an actual disruption requirement on all prohibited speech, allows the Rule to survive constitutional scrutiny because is otherwise viewpoint discrimination. As Plaintiffs point out, by their nature, "personal, impertinent and slanderous remarks will be critical. No one could be deemed impertinent while praising the City Council." (Plaintiff's Mot. at 32.) "The council members should [know] that the government may never suppress viewpoints it doesn't like." Norse, 629 F.3d at 979 (Kozinski, J. concurring). Nonetheless, because the Ninth Circuit interpreted a similar statute and found that it resisted a facial challenge, the court here likewise holds that the Rule is constitutional insofar as it is interpreted by the Council as requiring an "actual disruption" separate from the bare violation of the Rule.

The court notes, however, that this is an uncomfortable result. Without the "actual disruption" requirement, the Rule would be unconstitutional viewpoint discrimination. Acosta, 718 F.3d at 812 (holding that a city council rule of decorum prohibiting "any personal, impertinent, profane, insolent, or slanderous remarks" without requiring an actual disruption is unconstitutional). With the "actual disruption" requirement, any speech covered by the first two parts of the rule would also qualify under the broader (and more likely constitutional) final category of "disorderly conduct that disrupts, disturbs or

---

[7] As discussed below, the video evidence suggests that City Council members interpret the rule in this way.

otherwise impedes the orderly conduct of any Council meeting."  The restrictions on personal, impertinent, and slanderous remarks therefore serve no purpose in the Rule; they are remnants of unconstitutional restrictions saved from invalidity only by the qualification of "actual disruption" that arguably applies to them.  Those restrictions on speech are thus at best superfluous.  At worst, they chill constitutionally protected political speech.  The rule contains a list of prohibited (and unconstitutionally restrictive) types of speech that is then, much less explicitly, qualified by the actual disruption requirement and thereby rendered constitutional.  Although the Rule may help the Council meetings run more smoothly, it verges on violating the core right of citizens to criticize their democratically elected officials.  And, as discussed below, because of its phrasing, it is easy to apply the Rule in an unconstitutional manner.

Nonetheless, Ninth Circuit precedent compels upholding the Rule insofar as it is interpreted to include an "actual disruption" requirement.[8]  For the reasons discussed above, this requirement must be applied scrupulously in order to avoid violating the First Amendment.

### 2. As-applied Challenge

"Norwalk permits the City to eject anyone for violation of the City's rules--rules that were only held to be facially valid to the

---

[8] This said, the City would do well to consider revising the Rules of Decorum to make it clear that an actual disruption is required before a speaker can be ejected.  As discussed below, the court finds, based on the video evidence, that the Rules of Decorum are unconstitutional as applied.  Revising the Rules of Decorum to indicate that an actual disruption is required would provide clear guidance to the City Council to help it conduct its business within the bounds of the First Amendment.

1  extent that they require a person actually to disturb a meeting

2  before being ejected." Norse v. City of Santa Cruz, 629 F.3d at

3  976.  The court now considers whether Plaintiffs Dowd and Saltsburg

4  actually disturbed the City Council meeting prior to being ejected.

5  **a. Actual Disruption Standard**

6      The Ninth Circuit has not defined "actual disruption" with

7  precision.  Actual disruption need not resemble a breach of the

8  peace or fighting words.  Norwalk, 900 F.2d at 1425.  "A speaker

9  may disrupt a Council meeting by speaking too long, by being unduly

10 repetitive, or by extended discussion of irrelevancices.  The

11 meeting is disrupted because the Council is prevented from

12 accomplishing its business in a reasonably efficient manner." Id.

13 at 1426.

14      Although the standard for disruption is relatively low, a

15 disruption must in fact have occurred.  "Actual disruption means

16 actual disruption.  It does not mean constructive disruption,

17 technical disruption, virtual disruption, nunc pro tunc disruption,

18 or imaginary disruption.  The City cannot define disruption so as

19 to include non-disruption to invoke the aid of Norwalk." Norse,

20 629 F.3d at 976 (9th Cir. 2010).  "The Supreme Court long ago

21 explained that 'in our system, undifferentiated fear or

22 apprehension of disturbance is not enough to overcome the right to

23 freedom of expression.'" Id. at 979 (Kozinski, J. concurring.),

24 quoting Tinker v. De Moines Ind. Cmty. Sch. Dist., 393 U.S. 503,

25 508 (1969).

26      In some cases, the line between actual and potential

27 disruption is difficult to draw.  In Kindt v. Santa Monica Rent

28 Control Bd., 67 F.3d 266 (9th Cir. 1995), the Ninth Circuit held

that it was permissible to remove a man who had previously
disrupted proceedings of the same meeting when his "cohort" and
frequent partner in disruption made an obscene gesture "which
threatened to start the disruption all over again." Id. at 271.
However, in Norse, the Ninth Circuit held that there had not
clearly been a disruption when a man "gave the Council a silent
Nazi salute" and was then ejected and arrested, rejecting the
City's definition of "disturbance" as "any violation of its decorum
rules." Norse, 629 F.3d at 976.

At a minimum, the disturbance must be something more than the
bare violation of a rule.  In Acosta, the Ninth Circuit favorably
considered two jury instructions indicating that actual disruption
is measured by an effect on the audience and that profanity without
more is not an actual disruption.  718 F.3d at 810 n.5 ("Whether a
given instance of alleged misconduct substantially impairs the
effective conduct of a meeting depends on the actual impact of that
conduct on the course of the meeting." . . . "A speaker may not be
removed from a meeting solely because of the use of profanity
unless the use of profanity actually disturbs or impedes the
meeting.").

The power to determine when a disruption has occurred has been
placed in the hands of the moderator.  Norwalk, 900 F.2d at 1426
("The role of a moderator involves a great deal of discretion.
Undoubtedly, abuses can occur, as when a moderator rules speech out
of order simply because he disagrees with it, or because it employs
words he does not like.")  The disruption cannot be the reaction of
a Councilmember who is attacked.  Norse, 629 F.3d at 979 (CJ.
Kozinski concurring) ("Though defendants point to Norse's reaction

1  to Councilman Fitzmaurice as the 'disruption' that warranted
2  carting him off to jail, Norse's calm assertion of his
3  constitutional rights was not the least bit disruptive.  The First
4  Amendment would be meaningless if Councilman Fitzmaurice's petty
5  pique justified Norse's arrest and removal.")

6  **b. As-applied Challenge**

7      The Ninth Circuit has identified two types of as-applied
8  challenges.  The first "paradigmatic type" is "one that tests a
9  statute's constitutionality in one particular fact situation while
10 refusing to adjudicate the constitutionality of the law in other
11 fact situations." <u>Hoye v. City of Oakland</u>, 653 F.3d 835, 854 (9th
12 Cir. 2011)(citation and internal quotation marks omitted).  The
13 second type is "based on the idea that the law itself is neutral
14 and constitutional in all fact situations, but that it has been
15 enforced selectively in a viewpoint discriminatory way.  Such a
16 challenge . . . is dependent on the factual evidence provided as to
17 how the statutory scheme has in fact operated vis-à-vis the
18 plaintiffs." <u>Id.</u> (citation and internal quotation marks omitted).

19     Plaintiffs have not presented evidence of the second type of
20 as-applied challenge.  Deposition evidence of Council members or
21 other types of policy evidence would be required for the court to
22 extrapolate from the video, transcript, and declaration evidence
23 and find that there is a policy, rather than isolated instances, of
24 unconstitutional application.

25 ///
26 ///
27 ///
28 ///

36

The court therefore considers the specific instances in which Plaintiffs contend that the Rules of Decorum were unconstitutional as applied.[9]

### c. Incidents

The first three incidents took place on March 4, 2008, August 13, 2008, and June 12, 2009, prior to the amendment of the Rules on July 29, 2009.  (FAC ¶ 64.)  Plaintiffs assert that their challenge applies to the Rules prior to their amendment and to the amended Rules.  The FAC is ambiguous on this point.  However, nowhere in their briefing do Plaintiffs present the pre-2009 Rules, which may or may not contain the same provisions Plaintiffs are challenging. The court therefore declines to consider the first three incidents.

Plaintiffs have identified approximately ten[10] additional incidents involving Plaintiffs David Saltsburg ("Zuma Dogg" or "Dogg") and Matt Dowd when they attended City Council meetings. (Joint Statements RE Incidents 4 - 13.)  The court has reviewed the video recordings and transcripts of the incidents provided by the parties.  The evidence often demonstrates significant tolerance of citizen speech on the part of the members of the City Council. Dowd and Dogg were frequent speakers at City Council meetings and were ejected from only a handful of them.  However, the court finds that each identified incident involves an unconstitutional application of the Rules of Decorum.  The fact that these incidents represented a fraction of Dowd and Dogg's appearances at City Council meetings does not mitigate the constitutional violations. Additionally, although the court does not have enough evidence to

---

[9]The court requested supplemental briefing identifying these incidents.
[10] Incidents 8 and 9 appear to be substantially overlapping.

1  determine that the City has a policy of applying the Rules in an
2  unconstitutional fashion, it appears from the video evidence that
3  the City Council and the representative of the City Attorney do not
4  always require a disruption beyond the breach of the Rules of
5  Decorum.  Additionally, they appear to interpret the use of
6  profanity as an actual disruption per se.

7  For instance, in Incident No. 4., on Sept. 2, 2009, Plaintiff
8  Dowd addresses the City Council and says "First of all, your
9  president is pathetic and hopeless and is not doing a very good job
10 and you need to get together and lose her because, because see when
11 Eric is not here - sit down [Councilman] LaBonge, just sit down."
12 (Joint Statement RE Incident No. 4 at 1.)  Council members then
13 discuss the incident with City Attorney Dion O'Connell who advises
14 them as follows: "The speaker should not engage in personal attacks
15 on the councilmembers.  He can speak about the performance of the
16 City services and the councilmembers but not engage in personal
17 attacks."  (<u>Id.</u>)  Dowd begins speaking again.

18
    DOWD:       See when it's just me it's I, Matthew Dowd and
                when I'm talking to you that's the part that's
19              not allowed but when I'm talking about you
                that's the third person and you did it to me
20              yesterday so I'm filing on the decorum.  I got
                to sue for the 42.15 you are still using the
21              words inextricably intertwined but there's no
                guidelines for what that fucking means.  I am
22              tired. . . .
    PERRY:      Thank you very much, that is the end of your
23              time now.[11]
    LABONGE:    He should be removed.
24  PERRY:      Okay, thank you.
    LABONGE:    He should be removed from the meeting.
25  PERRY:      Mr. Officer if you can please escort Mr. Dowd
                to the door.  Thank you very much.
26      . . .
    O'CONNELL:  It is within the Council's discretion to ban
27

28      [11] The video appears to indicate that Dowd had 15 seconds
    remaining on his clock.

```
 1                       him from attending, or from speaking, he can
                         attend the meetings but he can't speak for a
 2                       certain amount of time.  In the past it has
                         been 3 days, then since the new Council rules,
 3                       Council can ban him for up to 30 days.
           PERRY:        Would someone like to make a motion.
 4         ZINE:         I make a motion for 30 days.
```

The council then voted 11 to 1 to ban him for 30 days.

The City argues that "Dowd's actions disrupted the meeting by shifting the focus to the speaker's improper language and conduct rather than the issues and business before the Council.  His personal attacks directed toward individual Councilmembers did not further the governmental process or enlighten either the Council or the public regarding items of City business, they simply delayed the City Council meeting and impeded the City Council's ability to efficiently complete its business." (Defendant's Position on Incident No. 4 at 1.)  The court disagrees.  Calling the Council president "pathetic and hopeless" and saying she is "not doing a very good job and you need to get together and lose her" is political speech at the heart of the First Amendment.  As Councilwoman Perry says during the incident, "Whether I like what he has to say or not, which I actually don't like, . . . he still has the right to say it."  (Joint Statement RE Incident No. 4 at 2.)  While the frustration of Councilmemebers is understandable, so is the frustration of Dowd at experiencing an interruption that "broke[] [his] whole thread."  (Id.)

The City does not point to, nor does the court discern in the video, any disruption beyond Dowd's speech.  It appears based on this video, taken with the other incidents, that it was Dowd's use of a profanity ("there's no guidelines for what that fucking means") that was the basis for dismissing him from the meeting and

for the weighty punishment of barring him from speaking for 30 days.[12]  But '[a] speaker may not be removed from a meeting solely because of the use of profanity unless the use of profanity actually disturbs or impedes the meeting."  <u>Acosta</u>, 718 F.3d at 810 n.5.  The court finds that no actual disturbance took place here. This is also the case in Incidents 5, 7, 8, 9, 10, 11, 12, and 13. In all of those instances, the court finds that there is no actual disturbance beyond breaching the Rules by the use of profanity.

If profanity takes a speaker off topic, it could be grounds to silence the speaker because it would impede the progress of the meeting.  However, the profanity in the video evidence of these incidents is in the service of making a point that is related to the issue at hand, if not taking the discussion in the direction that the Council intends.  For instance, in Incident No. 12, February 14, 2012, Zuma Dogg used a profanity as an intensifier in the context of a critique of the City Attorney.  (Joint Statement RE Incident No. 12 at 2 ("[T]hen we'll see what the jury has to say so Carmen Trutanich can spend millions and millions and millions and millions of dollars [and] outside counsel can drag it out and I only want a fraction.  As Matt Dowd would say that is fucked up.").)

Additionally, even where profanities are not involved, in some instances, the City's determination that certain comments are not

---

[12] Taken together, the evidence strongly suggests that the City Council believed that profanity was a sufficient basis on which to eject a speaker.  For instance, in Incident No. 11, February 14, 2012, Dogg is allowed without interruption to sing a rendition of a Whitney Houston song to express his love for Councilmember Parks, but is ejected when he says, "As Matt Dowd would say that is fucked up."  (Joint Statement RE Incident No. 12 at 2.)  The song is not considered a disruption, but the profanity is.

on topic results in a limitation of political speech.  For

instance, in Incident No. 6 from October 15, 2010, Dowd was again

removed from a meeting, this time because he was not on topic.  The

subject was the funding of the Pacoima Christmas Parade.  Pacoima

is in City Council District 7, of which Richard Alarcon was the

representative.  Before Dowd began to comment, Dogg stated, "My

public comment is that I want council to discuss the legality of

this when you've got a criminal taking the money."   Dowd then came

to the podium.  Dowd and Councilman Zine had an interchange about

the relevance of Dogg's and Dowd's comments to the agenda item:

| | |
|---|---|
| ZINE: | The subject matter is the Christmas Parade. That's the debate right now. |
| DOWD: | Okay, and I'm talking about Richard Alarcon's performance in his council district.  What's wrong with that? |
| ZINE: | That is not the issue.  That is not the issue. |
| DOWD: | It's in his district and he's getting money out of the general fund . . . |
| ZINE: | The issue is the Christmas Parade in Pacoima . . . |
| DOWD: | Get the City Attorney, please, get your head on the hook . . . |
| ZINE: | The Christmas Parade is the subject . . . |
| DOWD: | Exactly, and I'm against it because Richard Alarcon shouldn't be a councilman right here and if he stays you're going to have to put up with it . . . |
| ZINE: | Mr. Dowd, Mr. Dowd, you're finished for the day |
| DOWD: | . . . public comment |
| ZINE: | Mr. Dowd, you're finished for the day.  You're finished for the day, Mr. Dowd.  Sergeant at Arms, remove him from chambers.  He's finished for the day. |

(Joint Statement RE Incident No. 6 at 10.)  The court finds the

discussion of a councilman's alleged criminal activities is

relevant to a discussion of funding that the City intends to give

to that councilman's District.  Indeed, this incident is exemplary

of why it is unconstitutional to restrict speakers from making

personal attacks in City Council meetings; it chills speech

1  critical of elected officials, which is speech at the heart of the
2  First Amendment.

3      In one of the largest cities in the world, it is to be
4  expected that some inhabitants will sometimes use language that
5  does not conform to conventions of civility and decorum, including
6  offensive language and swear-words.  As an elected official, a City
7  Council member will be the subject of personal attacks in such
8  language.  It is asking much of City Council members, who have
9  given themselves to public service, to tolerate profanities and
10 personal attacks, but that is what is required by the First
11 Amendment.  While the City Council has a right to keep its meetings
12 on topic and moving forward, it cannot sacrifice political speech
13 to a formula of civility.  Dowd and Dogg "may be a gadfly to those
14 with views contrary to [their] own, but First Amendment
15 jurisprudence is clear that the way to oppose offensive speech is
16 by more speech, not censorship, enforced silence or eviction from
17 legitimately occupied public space." Gathright v. City of
18 Portland, Or., 439 F.3d 573, 578 (9th Cir. 2006).  The city that
19 silences a critic will injure itself as much as it injures the
20 critic, for the gadfly's task is to stir into life the massive
21 beast of the city, to "rouse each and every one of you, to persuade
22 and reproach you all day long." (Plato, Five Dialogues, Hackett,
23 2d Ed., Trans. G.M.A. Grube, 35 (Apology).)

24     The court GRANTS summary judgment to Plaintiffs on the as-
25 applied challenge to the Rules of Decorum.  The court declines to
26 issue a preliminary injunction but finds that the provisions of the
27 Rules of Decorum at issue here are constitutional only when there
28 is an actual disruption beyond a per se breach of the Rules.

1              **3. California Constitution**

2        The California Constitution provides, "Every person may freely

3   speak, write and publish his or her sentiments on all subjects,

4   being responsible for the abuse of this right. A law may not

5   restrain or abridge liberty of speech or press."  Cal. Const. art.

6   I, § 2.  "The California Constitution, and California cases

7   construing it, accords greater protection to the expression of free

8   speech than does the United States Constitution."  Gonzales v.

9   Superior Court, 180 Cal. App. 3d 1116, 1122 (Ct. App. 1986).

10  Because the California Constitution is more protective of free

11  speech than the U.S. Constitution, the court finds that as applied

12  the Rules of Decorum violate Article I § 2 as well.[13]

13       **E. Damages Claims**

14       The City has presented evidence indicating that Plaintiffs did

15  not suffer economic loss due to the 2008 Ordinance.  (See, e.g.,

16  City Exhs. 28, 49, 68, 317, 325, 327-32, 335-44, 355-56, 360, 362.)

17  Plaintiffs have presented evidence in the form of their

18  declarations indicating that they suffered economic loss and

19  potentially compensable emotional distress.  (See, e.g., Saltsburg

20  Decl. ¶ 74.)  Emotional distress damages need not be based on

21  objective evidence.  Zhang v. American Gem Seafoods, Inc., 339 F.3d

22  1020, 1040 (9th Cir. 2003), citing Passatino v. Johnson & Johnson

23  Consumer Prods., Inc., 212 F.3d 493, 513 (9th Cir. 2000).  The

24  court finds that there is an issue of fact as to the compensatory

25  damages suffered by Plaintiffs and DENIES summary judgment on the

26  issue of damages.

27  _____
        [13] Due to insufficient briefing, the court declines to address
28  whether the Rules of Decorum are facially unconstitutional under
    the California constitution.

1    **IV. CONCLUSION**

2       For the reasons stated above, the court GRANTS summary

3 judgment in favor of Defendants on the 2006 Ordinance.  The court

4 GRANTS summary judgment in favor of Defendants on the Permit and

5 Lottery system, the height restriction, the rotation requirement,

6 and the sunset requirement.  The court GRANTS summary judgment in

7 favor of Plaintiffs on the amplified sound ban.  The court GRANTS

8 summary judgment in favor of Defendants on the facial

9 constitutionality of the Rules of Decorum under the United States

10 Constitution, but GRANTS summary judgment in favor of Plaintiffs on

11 their as-applied challenge to the Rules of Decorum under the United

12 States Constitution and the California constitution.  The court

13 declines to issue a preliminary injunction but finds that the

14 provisions of the Rules of Decorum at issue here are constitutional

15 only when there is an actual disruption beyond a per se breach of

16 the Rules.  The court DENIES summary judgment on the issue of

17 damages.

18

19 IT IS SO ORDERED.

20

21

22 Dated:   August 7, 2013

23                              DEAN D. PREGERSON
                             United States District Judge

24

25

26

27

28

44